## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J-H-J, Inc., *et al.*[1], | ) | Case No. 19-51367 |
| | ) | |
| Debtors | ) | Jointly Administered |
| | ) | |

## DISCLOSURE STATEMENT RELATING TO
## JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR J-H-J, INC., *ET AL.*

**THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

Dated: October 2, 2020

**THE STEFFES FIRM, LLC**
William E. Steffes
bsteffes@steffeslaw.com
Barbara B. Parsons
bparsons@steffeslaw.com
13702 Coursey Blvd., Bldg. 3
Baton Rouge, Louisiana 70817
(225) 751-1751
(225) 751-1998 Facsimile
*Counsel to the Debtors*

---

[1] Lafayette Piggly Wiggly, LLC (19-51366), T.H.G. Enterprises, LLC (19-51368), SVFoods Old Hammond, LLC (19-51369), SVFoods Jefferson, LLC (19-51370), T&S Markets, LLC (19-51371), TSD Markets, LLC (19-51372), Baker Piggly Wiggly, LLC (19-51373), and BR Pig, LLC (19-51374), jointly administered with J-H-J, Inc. (19-51367).

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 4

II. NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ................. 13

III. EXPLANATION OF CHAPTER 11 ..................................................................... 16

    A.   Overview of Chapter 11 ............................................................................ 16

    B.   Chapter 11 Plan ....................................................................................... 17

    C.   Confirmation of a Chapter 11 Plan ........................................................... 17

IV. OVERVIEW OF THE PLAN .............................................................................. 18

V. GENERAL INFORMATION ............................................................................... 22

    A.   The Debtors ........................................................................................... 22

    B.   Organizational Structure and Management ............................................... 23

    C.   Pre-petition Financing .............................................................................. 23

    D.   Factors That Precipitated the Debtors' Chapter 11 Filing .............................. 24

VI. THE CHAPTER 11 CASES .............................................................................. 24

    A.   Filing of the Petitions and Debtor in Possession Status ............................... 24

    B.   First Day Pleadings and Orders ................................................................ 24

    C.   Employment of Professionals for the Debtors ............................................ 24

    D.   Appointment of the Committee. ............................................................... 24

    E.   Use of Cash Collateral. ............................................................................ 25

    F.   Exclusivity ............................................................................................. 25

    G.   Claims Bar Date ...................................................................................... 25

    H.   20 Day Claim Bar Date ............................................................................ 25

    I.   Payment of Administrative Expense Claims .............................................. 25

VII. POTENTIAL LITIGATION ............................................................................... 26

    A.   Retained Estate Causes of Action. ............................................................ 26

    B.   Pending Litigation. .................................................................................. 28

VIII. THE CHAPTER 11 PLAN .............................................................................. 28

    A.   Classification. ......................................................................................... 28

    B.   Treatment of Claims Against and Equity Interests in the Debtors. ................. 29

    C.   Sources of Cash for Plan Distributions. ..................................................... 33

    D.   Discharge of the Debtors ......................................................................... 33

    E.   Exculpation, Injunction and Limitation of Liability ...................................... 33

IX. CONFIRMATION AND CONSUMMATION PROCEDURES .......................................... 34

    A.   Overview ................................................................................................................ 34

    B.   Confirmation of the Plan ....................................................................................... 34

    C.   Confirmation without Acceptance of All Impaired Classes – "Cramdown" ................... 37

    D.   Effect of Confirmation ......................................................................................... 37

X. TAX ISSUES ................................................................................................................ 38

XI. Treatment of Executory Contracts and Unexpired Leases ................................................... 38

    A.   Assumption and Rejection of Executory Contracts and Unexpired Leases. .................. 38

    B.   Claims for Cure Payments arising from Assumption of Unexpired Leases or Executory Contracts. ....................................................................................................................... 40

    C.   Claims Arising from Rejection, Expiration or Termination. ......................................... 40

XII. RISK FACTORS .......................................................................................................... 41

    A.   Certain Bankruptcy Considerations ...................................................................... 41

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .... 42

XIV. CONCLUSION ........................................................................................................... 43

## **EXHIBITS**

Chapter 11 Plan of Reorganization ............................................................... Exhibit "A"

Disclosure Statement Order ......................................................................... Exhibit "B"

Pending Litigation………………………………………………………………….. Exhibit "C"

Chapter 7 Liquidation Analysis ..................................................................... Exhibit "D"

Financial Projections (Consolidated) ............................................................. Exhibit "E"

Rejected Executory Contracts and/or Unexpired Leases ................................. Exhibit "F"

# I.
# INTRODUCTION

**All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (see, *e.g.,* Article I, Section 1.1 of the Plan). Unless otherwise stated, all references herein to "Exhibits" are references to exhibits to this Disclosure Statement.**

**Definitions.**

As used herein, capitalized terms shall have the respective meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

- <u>20 Day Claim</u> means a Claim Filed by a supplier of goods for the value of goods sold to the Debtors in the ordinary course of business and which goods were received by the Debtors within 20 days before the Petition Date entitled to priority under section 503(b)(9) and 507(a)(2) of the Bankruptcy Code.

- <u>20 Day Claim Bar Date</u> means July 30, 2020, the deadline for Filing a 20 Day Claim pursuant to Order of the Bankruptcy Court [Doc. 332].

- <u>Administrative Bar Date</u> means the deadline for Filing requests for payment of Administrative Expense Claims, other than 20 Day Claims, which: (a) with respect to Administrative Expense Claims other than Fee Claims, shall be 30 days after the Effective Date; and, (b) with respect to Fee Claims, shall be 45 days after the Effective Date.

- <u>Administrative Expense Claim</u> means a Claim (other than a Claim included in a Class under this Plan) that is entitled to priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code or Order of the Bankruptcy Court, including, without limitation, (i) Claims incurred by the Debtors (or their Estates) on or after the Petition Date and before the Effective Date for the actual, necessary costs and expenses of preserving the Estates, including, without limitation, Fee Claims, and (ii) 20 Day Claims.

- <u>Affiliate</u> shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code, and when used with reference to any Debtor, shall include, but not be limited to, each of the other Debtors.

- <u>Allowed</u>, when used

  - with respect to any Claim, means such Claim to the extent it is not a Contested Claim or a Disallowed Claim; and

  - with respect to Equity Interests in any Debtor, means the Equity Interests in such Debtor as reflected in the stock ledger or similar register of such Debtor as of the Effective Date.

4

For the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon any potentially applicable rights of avoidance, setoff, or subordination, and any other grounds or defenses.

For the further avoidance of doubt, any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed" under this Plan absent further Order of the Bankruptcy Court.  Unless otherwise specified in this Plan or by Order of the Bankruptcy Court, "Allowed" Claims shall not, for the purposes of computation of distributions under the Plan, include interest on such Claims from and after the Petition Date.

- Assets means each and every item of property and interest of the Debtors or the Estates as of the Effective Date, whether tangible or intangible, legal or equitable, liquidated or unliquidated, wherever located, including, without limitation, (i) all rights, titles, and interests of the Estates in property of any kind as specified in section 541 of the Bankruptcy Code; (ii) all Cash and Causes of Action (including, without limitation, Avoidance Actions) belonging to the Debtors or their Estates; (iii) all rights in and proceeds of insurance policies applicable to the Debtors or their Estates; and (iv) any other rights, privileges, including but not limited to the attorney-client privilege, deferred taxes, claims, causes of action or defenses, whether arising by statute or common law, and whether arising under the laws of the United States, other countries, or applicable state or local law, belonging to the Debtors or their Estates.

- Assumed Leases means the real and personal property leases assumed by the Debtors under section 365 of the Bankruptcy Code pursuant to the Store Leases Order or any other order of the Bankruptcy Court.

- Avoidance Actions means all Causes of Action of the Estates that arise under chapter 5 of the Bankruptcy Code, including under section 502, 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code, and any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise.

- Avondale Debtors means SVFoods Avondale, LLC, SVFoods Harvey, LLC, SVFoods Westwego, LLC, SVFoods Big Pic, LLC, and SVFoods Little Pic, LLC, each a chapter 11 debtor in the jointly administered Case No. 19-51526, *In re SVFoods Avondale, LLC*, currently pending before the Bankruptcy Court.

- Avondale Auction Proceeds means all net proceeds, held in an escrow account of Grafe Auction Company, generated from the auctions of equipment owned by certain affiliates of the Debtors, namely, SVFoods Avondale, LLC, SVFoods Westwego, LLC, SVFoods Big Pic, LLC, and SVFoods Little Pic, LLC.

- BakerPW means Baker Piggly Wiggly, a Debtor in the Chapter 11 Cases.

- Ballot means the voting form distributed to each holder of an Impaired Claim entitled to vote on the Plan, on which the holder is to indicate acceptance or rejection of the Plan

5

in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

- **Bankruptcy Code** means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

- **Bankruptcy Court** means the United States Bankruptcy Court for the Western District of Louisiana.

- **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases.

- **Bar Dates** means the General Bar Date, the 20 Day Claim Bar Date, the Administrative Claim Bar Date, and any other applicable deadline to File a proof of claim in the Chapter 11 Cases.

- **BR Pig** means BR Pig, LLC, a Debtor in the Chapter 11 Cases.

- **Business Day** means any day other than a Saturday, a Sunday, a "legal holiday" (as defined by Bankruptcy Rule 9006(a)), or any other day on which commercial banks are required or authorized to close for business in New York, New York.

- **Cash** means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

- **Causes of Action** means all claims, actions, causes of action, choses in action, liabilities, obligations, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, foreseen, unforeseen, asserted, assertable directly or derivatively, arising in law, equity or otherwise, that are or may be pending on the Effective Date or that may be instituted or prosecuted by the Debtors, against any Person, whether asserted or unasserted as of the Effective Date, including, without limitation: (i) the right to object to Claims; and, (ii) all avoidance powers, actions (including all claims and causes of action arising under chapter 5 of the Bankruptcy Code), rights, remedies or affirmative defenses under the Bankruptcy Code and state law. Any and all Causes of Action are preserved under the Plan.

- **Chapter 11 Cases** means the cases commenced on the Petition Date by the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and being jointly administered by the Bankruptcy Court under the lead case styled *In re J-H-J, Inc.*, Case No. 19-51367.

6

- <u>Claim</u> shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

- <u>Claim Objection Deadline</u> means the deadline for filing objections to Claims as set forth in Section 9.1 of the Plan.

- <u>Class</u> means a category of Claims or Equity Interests set forth in Article III of this Plan, as such term is used and described in section 1122 and section 1123(a)(1) of the Bankruptcy Code.

- <u>Committee</u> means the official committee of unsecured creditors appointed in the Chapter 11 Cases by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code.

- <u>Confirmation Date</u> means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

- <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be continued from time to time.

- <u>Confirmation Order</u> means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

- <u>Contested</u>, when used

  ○ with respect to a Claim, means such Claim

    **1** to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part, and as to which no proof of claim has been Filed;

    **2** if it is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a proof of claim has been Filed with the Bankruptcy Court, to the extent (A) the proof of claim amount exceeds the amount indicated in the Schedules, or (B) the proof of claim priority differs from the priority set forth in the Schedules, in each case as to which an objection was Filed on or before the Claim Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court or the Plan;

    **3** if it is not listed in the Schedules or was listed in the Schedules as disputed, contingent or unliquidated, in whole or in part, but as to which a proof of claim has been Filed with the Bankruptcy Court, in each case as to which an objection was Filed on or before the Claim Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court or the Plan; or

    **4** as to which an objection has been or may be Filed on or before the Claim Objection Deadline; <u>provided</u>, that a Claim that is fixed in amount and priority pursuant to the Plan or by Final Order on or before the Effective Date shall not be a Contested Claim; and

7

o  with respect to an Equity Interest, means such Equity Interest to the extent it is not reflected on the applicable Debtor's stock transfer register as of the Effective Date.

• **Convenience Class Claim** means a General Unsecured Claim that is either (a) an Allowed Claim in an amount that is equal to or less than $10,000, or (b) an Allowed Claim in an amount that is greater than $10,000, but with respect to which the holder of such Allowed Claim voluntarily and irrevocably reduces the aggregate amount of such Allowed Claim to $10,000 pursuant to a Convenience Class Election.

• **Convenience Class Election** means a timely election by a holder of a General Unsecured Claim to reduce its aggregate Allowed Claim to $10,000 and agree to the classification and treatment of its Allowed Claim as a Class 7 Allowed Convenience Class Claim made in connection with, and pursuant to the procedures approved by the Bankruptcy Court governing voting on the Plan, including the form of the Ballot.

• **Debtors** means, collectively, J-H-J, Inc., Lafayette Piggly Wiggly, LLC, T.H.G. Enterprises, LLC, SVFoods Old Hammond, LLC, SVFoods Jefferson, LLC, T&S Markets, LLC, TSD Markets, LLC, Baker Piggly Wiggly, LLC, and BR Pig, LLC.

• **Debtor in Possession** means any of the Debtors, in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

• **Disallowed**, when used with respect to a Claim, means all or such part of a Claim that has been disallowed or released by a Final Order, operation of law, written release or settlement, the provisions of the Plan, or otherwise, or withdrawn by the holder of the Claim.

• **Disclosure Statement** means the disclosure statement Filed with respect to the Plan, as it may be amended, supplemented or otherwise modified from time to time, and the exhibits and schedules thereto.

• **Disclosure Statement Order** means the order entered by the Bankruptcy Court (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

• **Effective Date** means, with respect to each Debtor, a date selected by such Debtor which shall be a Business Day that is no later than five (5) days after all of the conditions specified in Section 10.2 have been satisfied or waived in accordance with Section 10.3 of this Plan.

• **Equity Interest** means (i) any outstanding ownership interest in any of the Debtors, including, without limitation, interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in any Debtor and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation, and (ii) any Claim against any of the Debtors that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

- <u>Estate(s)</u> means, individually or collectively, as applicable, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

- <u>Estate Cash</u> means, all Cash of the Debtors and the Estates as of the Effective Date.

- <u>Exculpated Parties</u> means all Persons that are or were at any time on or after the Petition Date, and whether or not any such Person currently retains such capacity or position, (i) the Debtors; (ii) the Committee or a member of the Committee; or (iii) Professional Persons, to the extent such parties are or were acting in such capacity on behalf of any of the Persons identified in (i) or (ii) above on or after the Petition Date.

- <u>Fee Application</u> means an application for allowance and payment of a Fee Claim.

- <u>Fee Claim</u> means a Claim of a Professional Person or a Claim for substantial contribution or reimbursement of expenses incurred as a member of the Committee pursuant to section 503(b) of the Bankruptcy Code.

- <u>File</u>, <u>Filed</u> or <u>Filing</u> means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court in accordance with the Bankruptcy Rules and Local Rules and/or Orders of the Bankruptcy Court.

- <u>Final Order</u> means an order or judgment of the Bankruptcy Court (or any other court or adjudicative body of competent jurisdiction) entered on the docket of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, motion for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or any other court or adjudicative body) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, no order or judgment shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be Filed with respect to such order.

- <u>General Bar Dates</u> means March 9, 2020 and July 30, 2020, the general deadline, as extended for certain parties, to File proofs of claim in the Chapter 11 Cases established by orders of the Bankruptcy Court [Doc. 150 and Doc. 329].

- <u>General Unsecured Claim</u> means any pre-Petition Date Claim against a Debtor that is not an Administrative Expense Claim (including Fee Claims), a fee payable pursuant to section 1930 of title 28 of the United States Code, a Priority Tax Claim, a Priority Non-Tax Claim, a Other Secured Claim, a Secured Claim, an Insured Claim, or an Intercompany Claim, and shall not include Disallowed Claims.

- <u>Iberia</u> means IberiaBank.

9

- **Iberia Collateral** means the Collateral as defined in *Exhibit 1* to proofs of Claim Nos. 25 - 33 Filed by Iberia.

- **Iberia Loans** means Loan No. xxxxxx8924 in the original principal amount of $2,975,000, Loan No. xxxxxx8207 in the original principal amount of $3,200,000, and Loan No. xxxxxx1842 in the original principal amount of $500,000, all as described more fully in the proof of Claim Filed by Iberia.

- **Iberia's Accrued Amounts** means all unpaid interest accrued under the Iberia Loans and SBA Loan through the Confirmation Date plus all attorneys' fees incurred by Iberia in connection with the Iberia Secured Claim.

- **Iberia Secured Claim** means the Claim Filed against the Debtors by Iberia in the Chapter 11 Case in the principal amount of $8,630,701.

- **Insider** means a Person that would fall within the definition ascribed to such term in section 101(31) of the Bankruptcy Code.

- **Insider Compensation Order** means the final order [Doc. 153] entered by the Bankruptcy Court on January 30, 2020 approving compensation for Insiders of the Debtors.

- **Insurance Policies** means, collectively, any policies of insurance coverage of any kind (including any and all amendments, endorsements, renewals, and extensions thereof) that at any time belonged or belong to or included or include any of the Debtors as a named insured, additional insured, or beneficiary.

- **Insured Claim** means any Claim, including without limitation any personal injury claims, against a Debtor for which the Debtor is entitled to indemnification, reimbursement, contribution or other payment under a policy of insurance wherein the Debtor is an insured or beneficiary of the coverage of any of the Debtors or any other Person.

- **Intercompany Claim** means a Claim held by any Debtor against any other Debtor.

- **Internal Revenue Code** means the Internal Revenue Code of 1986, as amended, codified at title 26 of the United States Code, together with any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements and other releases of the United States Treasury Department or the IRS.

- **IRS** means the Internal Revenue Service.

- **JHJ** means J-H-J, Inc., a Debtor in the Chapter 11 Cases.

- **LafayettePW** means Lafayette Piggly Wiggly, LLC, a Debtor in the Chapter 11 Cases.

- **Other Secured Claim** means a Claim, other than the Iberia Secured Claim and the SuperValu Secured Claim, that is (a) secured by a lien on any Assets, which lien is valid, perfected

10

and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) asserted against any Debtor that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; or (c) deemed or treated under the Plan as a Other Secured Claim.

- PACA Claim means that certain portion of the Supervalu Secured Claim in the amount of $104,871, asserted against the Debtors by Supervalu through its proofs of Claim Filed in the Chapter 11 Cases as well as through the related Adversary Proceeding No. 20-05003.

- Person means an individual, corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, trust, estate, unincorporated association, unincorporated organization, or any government, governmental entity, or political subdivision, department, agency, or instrumentality thereof, or any other entity.

- Petition Date means November 15, 2019, the date on which the Debtors commenced the Chapter 11 Cases.

- Plan means the joint chapter 11 plan for the Debtors in the Chapter 11 Cases, including all supplements, appendices and schedules hereto, either in their present form or as same may be amended, supplemented or otherwise modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

- Plan Distribution means the payment or distribution under the Plan of Cash, Assets, securities or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim.

- Plan Distribution Date means with respect to any Claim, (a) if such Claim is Allowed on the Effective Date, the first Business Day which is five (5) days after the Effective Date, or (b) if such Claim is not Allowed on the Effective Date, the first Business Day which is five (5) days after the date such Claim becomes Allowed.

- Plan Documents means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and Filed with the Bankruptcy Court as specified in Section 1.4 of the Plan including, without limitation, the Supply Agreement and the Plan promissory note referenced in Section 3.3(a)(2) of the Plan.

- Plan Proponents means the Debtors (each, a "Plan Proponent").

- Priority Tax Claim means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

11

- <u>Professional Person</u> means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

- <u>Released Parties</u> means all Persons that are or were at any time on or after the Petition Date, and whether or not any such Person currently retains such capacity or position, (i) Debtors; (ii) the Committee and its members; and (iii) Professional Persons, to the extent such parties are or were acting in such capacity on or after the Petition Date.

- <u>SBA Loan</u> means that certain Loan No. xxxxxx9560 in the original principal amount of $3,859,000 described more fully in proofs of Claim Nos. 25-33 Filed by Iberia.

- <u>Schedules</u> means, unless otherwise stated, the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs Filed by the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

- <u>Securities Act</u> means the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.

- <u>Store</u> means a retail grocery store operated by a Debtor.

- <u>Store Leases Order</u> means the September 11, 2020 order of the Bankruptcy Court [Doc. 407] authorizing the Debtors' assumption of real property leases of the Stores operated by LafayettePW, THG, SVOld Hammond, SVJefferson, T&S, TSD, BakerPW, BR Pig and, JHJ.

- <u>Supervalu</u> means SuperValu Wholesale Operations, Inc. as successor in interest to SuperValu Holdings, Inc. and other entities affiliated with SuperValu, Inc.

- <u>Supervalu Collateral</u> means the perfected, first priority security interests upon and with respect to accounts, inventory, equipment, general intangibles and all products and proceeds thereof, including cash and cash equivalents.

- <u>Supervalu Secured Claim</u> means the Claim Filed by Supervalu in the Chapter 11 Cases, including the Supervalu Administrative Claim and the PACA Claim.

- <u>Supply Agreement</u> means the Amended and Restated Supply Agreement between Supervalu and the Debtors, a Plan Document, which shall be entered into by the Debtors and Supervalu prior to the Effective Date of the Plan, and which shall replace all prior Supply Agreements between such parties.

- <u>SVJefferson</u> means SVFoods Jefferson, LLC, a Debtor in the Chapter 11 Cases.

- <u>SVOld Hammond</u> means SVFoods Old Hammond, LLC, a Debtor in the Chapter 11 Cases.

12

- **THG** means T.H.G. Enterprises, LLC, a Debtor in the Chapter 11 Cases.

- **T&S** means T&S Markets, LLC, a Debtor in the Chapter 11 Cases.

- **TSD** means TSD Markets, LLC, a Debtor in the Chapter 11 Cases.

- **Voting Deadline** means the deadline established by an order of the Bankruptcy Court for voting to accept or reject the Plan.

BY ORDER DATED _____, 2020 (THE "DISCLOSURE STATEMENT ORDER"), THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF LOUISIANA (THE "BANKRUPTCY COURT") APPROVED THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") RELATING TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR J-H-J, INC., *ET AL.* (THE "PLAN").

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "A", FILED BY J-H-J, INC. ("JHJ") AND ITS AFFILIATED DEBTORS (COLLECTIVELY, THE "DEBTORS"). ALL CLASSES OF CLAIMS AND INTERESTS ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS IN CLASSES 1 THROUGH 8.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY ___:___ .**M., PREVAILING CENTRAL TIME, ON _____, 2020 (THE "VOTING DEADLINE")**. FOR THE AVOIDANCE OF DOUBT, THE DEBTORS RESERVE THE RIGHT TO OBJECT TO CLAIMS AFTER THE VOTING DEADLINE. MOREOVER, FOR THE AVOIDANCE OF DOUBT, IT IS POSSIBLE THAT HOLDERS OF CLAIMS, INCLUDING UNSECURED CLAIMS THAT DO NOT APPEAR ON THE DEBTORS' SCHEDULES AND ARE NOT ALLOWED CLAIMS, WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIMS UNTIL THE EXPIRATION OF THE TIME PERIOD WITHIN WHICH CLAIM OBJECTIONS MUST BE FILED AS REFERENCED IN THE PLAN.

## II.
## NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN

The purpose of this Disclosure Statement is to enable you, whose Claim or Equity Interest is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. DELIVERY OF THIS DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN SINCE THAT DATE. THE DEBTORS HAVE NO DUTY TO, AND EXPRESSLY DISCLAIM ANY OBLIGATION TO, UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FINANCIAL INFORMATION, ILLUSTRATIVE CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED, AT LEAST IN PART, ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. MOREOVER, THE DEBTORS RESERVE ALL OF THEIR RESPECTIVE RIGHTS TO ASSERT THAT THE ALLOCATION OF VALUE MAY BE DIFFERENT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE

14

**CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS IN THESE CHAPTER 11 CASES.**

On _____, 2020, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order pursuant to section 1125 of the Bankruptcy Code, finding that the Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of holders of the solicited classes of Claims against the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim or Equity Interest entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and certain of the Professional Persons the Debtors have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Debtors. You should not rely on any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement, the exhibits hereto, and the Plan itself.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot and return the same to the address set forth on the Ballot so that it will be actually received by the Debtors' counsel, The Steffes Firm, LLC, 13702 Coursey Blvd., Bldg. 3, Baton Rouge, Louisiana 70817, Attn: Barbara B. Parsons, no later than the Voting Deadline. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. Votes which are cast in any other manner will not be counted. **All Ballots must be actually received by the Debtors' counsel no later than _____, 2020 at __:__ _.m., prevailing Central Time. For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as Exhibit "B".**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims and Interests even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

**THE PLAN CONTAINS BROAD RELEASES AND INJUNCTIONS THAT WILL AFFECT YOUR RIGHTS AS DESCRIBED IN SECTION VIII (D) OF THIS DISCLOSURE STATEMENT AND ARTICLE VIII OF THE PLAN. THESE RELEASES AND INJUNCTIONS INCLUDE, AMONG OTHERS: (I) A PERMANENT INJUNCTION**

15

**OF THE COMMENCEMENT OF ACTIONS AND THE PERFECTION OR ENFORCEMENT OF JUDGMENTS AND ENCUMBRANCES AGAINST THE DEBTORS AND THEIR ESTATES BY ANY ENTITY; (II) A RELEASE AND EXCULPATION OF CERTAIN "EXCULPATED PARTIES" WITH RESPECT TO, AMONG OTHER THINGS, THE CHAPTER 11 CASES AND THE PLAN; AND (III) A PERMANENT INJUNCTION OF ANY ACTION AGAINST ANY "EXCULPATED PARTY" RELATED TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.**

**Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") for _____, 2020 at __ : _.m., prevailing Central Time, before the Honorable John W. Kolwe, United States Bankruptcy Judge of the United States Bankruptcy Court for the Western District of Louisiana. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before _____, 2020 at __:__ _.m., prevailing Central Time, in the manner described in the Disclosure Statement Order attached hereto as Exhibit "B".**

**THE PLAN PROPONENTS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN**.

### III.
### EXPLANATION OF CHAPTER 11

**A.** **Overview of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its business for the benefit of its creditors, equity holders and other parties in interest. The Debtors commenced these jointly administered chapter 11 cases, captioned In re J-H-J, Inc., *et al.*, Case No. 19-51367 (the "Chapter 11 Cases"), with the filing of voluntary petitions (the "Petitions") for relief under chapter 11 of the Bankruptcy Code on November 15, 2019 (the "Petition Date").

The commencement of a chapter 11 case creates an estate comprised of all the legal and equitable interests of a debtor in property as of the date the petition is filed. Sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In the Chapter 11 Cases, the Debtors remain in possession of their property and continue to operate their business as debtors in possession.

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise

16

ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan.

## B.    <u>Chapter 11 Plan</u>

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, the plan becomes binding on a debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. For a description of key components of the Plan, see "Overview of the Plan," below.

After a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of impaired claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

## C.    <u>Confirmation of a Chapter 11 Plan</u>

If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. <u>See</u> "Confirmation and Consummation Procedures – Confirmation of the Plan," below. **The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan for the bankruptcy court to determine that the class has accepted the plan. <u>See</u> "Confirmation and Consummation Procedures."

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. <u>See</u> "Confirmation and Consummation Procedures." Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. All Classes are impaired under the Plan, and the holders of Claims and Equity Interests in such Classes are entitled to vote to accept or reject the Plan.

In general, a bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to

each impaired class of claims or equity interests that has not accepted the plan. See "Confirmation and Consummation Procedures".

# IV.
# OVERVIEW OF THE PLAN

The following is a summary of the treatment of Claims and Equity Interests under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit "A". In addition, see "The Chapter 11 Plan" section of this Disclosure Statement. For estimates regarding potential claim amounts and amounts available for distribution under the Plan, see the Liquidation Analysis attached to this Disclosure Statement as Exhibit "D".

The following charts summarize treatment of unclassified and classified Claims and Equity Interests under the Plan:

## Administrative Expense and Priority Tax Claims

| Claims[1] | Treatment |
|---|---|
| Administrative Expense Claims<br><br><br><br><br><br><br><br><br><br>Estimated Allowed Claims:<br>Estimated Recovery Percentage: 100% | Except to the extent any Person entitled to payment of an Allowed Administrative Expense Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, on the Plan Distribution Date, each holder of an Allowed Administrative Expense Claim shall receive, in full satisfaction if its Allowed Administrative Expense Claim, Cash in an amount equal to the amount of such Allowed Administrative Expense Claim; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim. |
| Priority Tax Claims<br><br><br><br><br><br><br><br><br>Estimated Allowed Claims: $0<br>Estimated Recovery Percentage: 100% | On the Plan Distribution Date, each holder of an Allowed Priority Tax Claim shall receive in full satisfaction of such Allowed Priority Tax Claim payment (a) in Cash equal to the amount of such Allowed Claim; or, (b) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Priority Tax Claim or that is less favorable than the treatment provided to the most favored General Unsecured Claims under the Plan. |

---

[1] Administrative Claims and Tax Claims are treated in accordance with section 1129(a) (9) of the Bankruptcy Code. Pursuant to section 1123(a) (1) of the Bankruptcy Code, such Claims are not designated as classes of Claims for the purposes of the Plan.

## Claims and Equity Interests

| Classes | Treatment |
|---|---|
| Classes 1A – 1I:  Supervalu Secured Claim<br><br>**Impaired** | On account of and in full satisfaction of the Supervalu Secured Claim, the holder shall be treated as follows:<br><br>(1)   Supervalu shall receive Cash in the amount of $104,871 on the Plan Distribution Date.<br><br>(2)  The balance of the Supervalu Secured Claim, *i.e.*, $7,223,327, shall be evidenced by a Plan promissory note (Plan Document) and related security documents in form and substance acceptable to Supervalu and the Debtors; shall continue to be secured by the Supervalu Collateral; and, shall be satisfied as follows:<br><br>  i.      Cash in the amount of $500,000 on the Plan Distribution Date;<br><br>  ii.     $4,138,741 shall be payable by the Debtors, over a seven-year term at an interest rate of 3% per annum, in weekly installment payments of $12,623.30 with a balloon payment of the balance due at maturity; and,<br><br>  iii.    $2,584,586 shall be satisfied in accordance with the terms of the Amended and Restated Supply Agreement.<br><br>(3)      All existing guarantees by parties other than the Debtors of the Supervalu Secured Claim, but excepting any guarantees of Danielle Satawa, shall be amended, restated and reaffirmed, as applicable, to apply to the obligations of the Debtors to Supervalu under the Plan.<br><br>(4)      The Debtors, for and on behalf of themselves and their principals and owners, shall release any and all claims against Supervalu, including without limitation, (a) any Avoidance Actions and (b) the claims against Supervalu, listed as an Asset in each of the Debtors' Schedules in an unknown amount, relating to the purchase of the stores formerly operated by SVFoods Avondale, LLC, SVFoods Harvey, LLC, SVFoods Westwego, LLC, SVFoods Big Pic, LLC, and SVFoods Little Pic, LLC. |
| Estimated Allowed Claims: $7,328,198<br>Estimated Recovery Percentage: 100% | |
| Class 2A – 2I: Iberia Secured Claim<br><br>**Impaired** | On account of and in full satisfaction of the Allowed Iberia Secured Claim, the holder shall be treated as follows:<br><br>(1) The Iberia Loans shall, for purposes of the Plan, be consolidated into a single loan obligation. After payment of Iberia's Accrued Amounts, the Iberia Loans, as consolidated, shall be amortized over 15 years at an interest rate of 5.25% and shall be payable in 36 consecutive   monthly   installments   as   follows: |

19

| | |
|---|---|
| | commencing on the Plan Distribution Date, the Debtors shall pay 35 equal monthly payments of $42,530.86 and one balloon payment for the balance due.<br><br>(2) After payment of Iberia's Accrued Amounts, the balance due under the SBA Loan shall be amortized over 15 years at a rate of 5.5% per annum. The resulting monthly payment shall be approximately $26,968.51.<br><br>(3) Iberia's Accrued Amounts shall be paid on the Plan Distribution Date.<br><br>(4) All Avondale Auction Proceeds shall be paid to Iberia on the Plan Distribution Date and applied to Iberia's Accrued Amounts. |
| Estimated Allowed Claims: $8,630,701.28<br>Estimated Recovery Percentage: 100% | (5) The Iberia Secured Claim shall continue to be secured by the existing Iberia Collateral and guarantees granted to Iberia in connection with the Iberia Loans and the SBA Loan. |
| Class 3A – 3D: Other Secured Claims<br><br>**Impaired**<br><br><br><br><br><br><br>Estimated Allowed Claims: $86,810<br>Estimated Recovery Percentage: 100% | In the sole discretion of the Debtors, each holder of an Allowed Other Secured Claim shall be treated in one of the following ways (for the avoidance of doubt, all holders of Allowed Other Secured Claims need not be treated in the same way as long as each is treated in one of the following ways):<br>(1)      on the Effective Date, the legal, equitable, and contractual rights of each holder of an Allowed Other Secured Claim shall be reinstated in accordance with the provisions of section 1124(2) of the Bankruptcy Code notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim before the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date; or,<br>(2)      on the Effective Date, the holder of an Allowed Other Secured Claim shall (i) retain a lien securing such Allowed Other Secured Claim and (ii) receive deferred Cash payments from the Debtors totaling at least the value of such Allowed Other Secured Claim as of the Effective Date; or<br>(3)      on the Effective Date, the collateral securing such Allowed Other Secured Claim shall be surrendered |

20

| | |
|---|---|
| | to the holder of such Allowed Other Secured Claim in full satisfaction of such Allowed Other Secured Claim; or |
| | (4)    the holder of an Allowed Other Secured Claim shall be paid Cash in an amount equal to the value of such holder's Allowed Other Secured Claim, on or before the later of (i) the Plan Distribution Date and (ii) the date that is ten (10) Business Days after the entry of a Final Order allowing such Claim as an Other Secured Claim, or as soon thereafter as practicable. To the extent the collateral securing an Allowed Other Secured Claim has been or is sold pursuant to an Order of the Bankruptcy Court, the amount paid to the holder of such Allowed Other Secured Claim pursuant to the preceding sentence shall be net of the costs of sale of such collateral and otherwise subject to the rights of the Debtors pursuant to section 506(c) of the Bankruptcy Code. |
| | Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition liens on property of the Debtors held with respect to an Allowed Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Claim until such Claim is satisfied, at which time such lien shall be released, shall be deemed null and void, and shall be unenforceable for all purposes; provided, however, that the Debtors may condition delivery of any final payment upon receipt of an executed release of the lien. Any and all liens securing any Other Secured Claim that is not Allowed shall be released, shall be deemed null and void, and shall be unenforceable for all purposes. Upon satisfaction or disallowance of a Other Secured Claim, the holder of a Other Secured Claim authorizes the appropriate Debtor(s) to file any UCC termination statements necessary to effect termination of any lien securing a Other Secured Claim. |
| Classes 4A – 4I:  General Unsecured Claims<br><br>**Impaired**<br><br>Estimated Allowed Claims: $4,899,295<br>Estimated Recovery Percentage: 40% | Each holder of a General Unsecured Claim shall receive, on account of and in full satisfaction of such Claim, Cash totaling 40% of the Allowed General Unsecured Claim, payable in 60 (sixty) consecutive installments, commencing on the first day of the quarter following the Effective Date. |
| Class 5A – 5I:  Convenience Class Claims<br><br>**Impaired**<br><br>Estimated Allowed Claims: $361,733<br>Estimated Recovery Percentage: 20% | Each holder of a Convenience Class Claim shall receive, in full satisfaction and settlement of its Allowed Convenience Class Claim, Cash totaling 20% of the Allowed Convenience Class Claim, payable in four (4) consecutive quarterly installments, commencing on the first day of the quarter following the Effective Date. |
| Class 6A – 6I:  Intercompany Claims<br>**Impaired**<br><br>Estimated Allowed Claims: $6,696,219<br>Estimated Recovery Percentage: 0% | On the Effective Date, all Intercompany Claims will be extinguished, and no holder of an Intercompany Claim will receive or retain any property or rights under the Plan on account of such Claim. |

| Class 7A – 7I:  Equity Interests **Impaired** | The Debtors shall not make any distributions on account of Allowed Equity Interests until the Allowed Claims of all non-Insider creditors have been paid in accordance with the terms of the Plan, except that if one or more Debtors is a Subchapter S corporation or a so-called "pass-through" entity or is taxed as a partnership entity, such Debtor(s) may make distributions to the holders of its Equity Interests in an amount equal to the state and federal income taxes of the holders of its Equity Interests attributable to the income of such Debtor(s). |
|---|---|

# V.
# GENERAL INFORMATION

## A.    The Debtors

On the Petition Date, the Debtors, collectively, owned and operated 12 Stores in south Louisiana under the names Shoppers Value or Food Depot.  Today, the Debtors operate nine (9) Stores and collectively employ approximately 315 Store-level and administration-level employees. The vast majority of the Debtors' employees are Store-level employees, compensated on an hourly wage basis. General administrative duties for all Debtors are handled by JHJ, which advances expense payments associated with such administration of the Debtors. Monthly, each of the other Debtors reimburse JHJ for the administrative expenses advanced and/or incurred on their behalf.

JHJ is a Louisiana corporation, formed in 1984.  On the Petition Date, JHJ operated two Stores in the Baton Rouge, Louisiana metropolitan area.  Following the permanent closure of its Greenwell Springs Store, JHJ now operates one Store in Baton Rouge, Louisiana. JHJ currently employs approximately 60 employees.

BakerPW is a Louisiana limited liability company, formed in 2006.  BakerPW operates one store in Baker, Louisiana and employs approximately 41 employees.

THG is a Louisiana limited liability company, formed in 1998.  THG operates one store in Baton Rouge, Louisiana and employs approximately 32 employees.

LafayettePW is a Louisiana limited liability company, formed in 2004.  On the Petition Date, LafayettePW operated two Stores in Lafayette, Louisiana.  Following the permanent closure of its University Avenue Store, LafayettePW now operates one Store and employs approximately 21 employees.

BRPig is a Louisiana limited liability company, formed in 2009.  BR Pig operates one Store in Baton Rouge, Louisiana and employs approximately 38 employees.

T&S is a Louisiana limited liability company, formed in 2014.  On the Petition Date, T&S operated two Stores in south Louisiana.  Following the permanent closure of its Baton Rouge Store, T&S now operates one Store in Bogalusa, Louisiana and employs approximately 23 employees.

TSD is a Louisiana limited liability company, formed in 2016.  TSD operates one Store in Lafayette, Louisiana and employs approximately 36 employees.

22

SVOld Hammond is a Louisiana limited liability company, formed in 2017. SVOld Hammond operates one Store in Baton Rouge, Louisiana and employs approximately 38 employees.

SVJefferson is a Louisiana limited liability company, which operates one Store in Jefferson, Louisiana and employs approximately 25 employees. In 2018, certain shareholders of JHJ formed SVJefferson and the Avondale Debtors for the purposes of purchasing six (6) Winn-Dixie grocery stores ("WD Stores") from the Southeastern Grocers, LLC bankruptcy estate. Due to significant losses sustained through operation of the WD Stores, only the SVJefferson Store remains open today. Prior to the Petition Date, all other WD Stores were closed and their equipment and inventory were liquidated.

## B.   Organizational Structure and Management

While each Store has a separate Store manager, as set forth above, JHJ handles the general administrative duties for all Debtors. The following is a list of the officers of JHJ and any Equity Interests associated with such officers:

- Garnett "Skip" Jones, Jr. serves as President and holds an Equity Interest in all Debtors;

- Ted Harvey serves as Vice-President and holds an Equity Interest in all Debtors except THG;

- Jeffrey Jones serves as Vice-President and holds an Equity Interest in JHJ, BR Pig, BakerPW, and, SVOld Hammond; and,

- Danielle Satawa serves as Chief Financial Officer; and, holds no Equity Interests in the Debtors.

Post-confirmation, the foregoing officers will continue to receive the compensation approved by the Bankruptcy Court through the Insiders Compensation Order.

## C.   Pre-petition Financing

JHJ and BR Pig each own retail shopping centers in Baton Rouge, Louisiana from which two of the Stores operate. The Iberia Loans were incurred in connection with purchases of such properties; and, each of the Debtors is solidarily liable for repayment of those loans.

Acquisition of the WD Stores was financed through the SBA Loan, *i.e.*, a secured loan from Iberia, guaranteed by the U.S. Small Business Administration. SVJefferson's and the Avondale Debtors' obligation to repay of the SBA Loan was guaranteed by all Debtors; and, is secured by the Iberia Collateral, which includes, *inter alia*, the real estate owned by JHJ and BR Pig. In connection with the WD Stores acquisition, the SVJefferson and the Avondale Debtors also incurred certain indebtedness in favor Supervalu for the purchase of grocery store inventory and related items required for the WD Store openings and operations. Repayment of such indebtedness to Supervalu was likewise guaranteed by the Debtors; and, is secured by the Supervalu Collateral.

23

D.     **Factors That Precipitated the Debtors' Chapter 11 Filing**

The Debtors' financial performance was primarily hampered by the losses sustained through the acquisition and operation of the WD Stores and the Debtors' guarantee of the associated indebtedness to Iberia and Supervalu. After closure of the Avondale Debtors' stores, the Debtors were left with the primary responsibility to repay such indebtedness from the income of the Debtors' Stores alone. In addition, due to multiple factors associated with the closure of these stores, Supervalu's rebate payments to the Debtors ceased during the year preceding the Petition Date. The additional debt load attributable to the Debtors' guarantee of the Avondale Debtors' obligations, coupled with the reduced rebate income, ultimately became unsustainable and led to the Debtors' commencement of the Chapter 11 Cases.

**VI.**
**THE CHAPTER 11 CASES**

A.     **Filing of the Petitions and Debtor in Possession Status**

On November 15, 2019, the Debtors commenced the Chapter 11 Cases. Pursuant to sections 1101, 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses (with the exception of the three Stores closed during the Chapter 11 Cases) and remain in possession of their property as "debtors in possession."

B.     **First Day Pleadings and Orders**

On or about the Petition Date, the Debtors filed multiple motions with the Bankruptcy Court, including: motion for entry of an order authorizing the Debtors to use cash collateral; motion establishing procedures for utility companies to request adequate assurance of payment; motion authorizing payment of employee wages; motion authorizing continued use of existing bank accounts; motion to pay Insiders; and a motion for joint administration of the Chapter 11 Cases. A hearing was held in the Bankruptcy Court on November 20, 2019 on the above-referenced motions and interim and final orders granting such motions were entered by the Bankruptcy Court shortly thereafter.

C.     **Employment of Professionals for the Debtors**

Pursuant to employment applications filed with the Bankruptcy Court and subsequent orders entered by the Bankruptcy Court, the Debtors have employed the following professionals to assist them with the administration of the Chapter 11 Cases: (i) The Steffes Firm, LLC as general bankruptcy counsel; and, (ii) Planche Politz Ledet, LLC as certified public accountants. All professionals retained by the Debtors have been, or will be, paid their allowed fees and expenses incurred on behalf of the Debtors pursuant to orders entered by and subject to final approval of the Bankruptcy Court.

D.     **Appointment of the Committee.**

On December 9, 2019, the Office of the United States Trustee appointed the Committee, which consists of the following members: (i) Scariano Brothers, LLC, (ii) Coca-Cola Bottling Company United, Inc., and (iii) Roberson Advertising Service, LLC. The Committee employed

24

the law firm of Heller, Draper, Patrick, Horn & Manthey, LLC to serve as its bankruptcy counsel. These professionals have been, or will be, paid their allowed fees and expenses incurred in the provision of their services to the Committee pursuant to Orders entered by and subject to final approval of the Bankruptcy Court.

## E.    Use of Cash Collateral.

On November 20, 2019, the Bankruptcy Court entered an interim order authorizing the use of cash collateral [Docket No. 38] (the "Initial Cash Collateral Order"), which provided for the Debtors to use cash otherwise subject to Supervalu's security interests for operating expenses pursuant to a stipulated budget. To provide adequate protection, Supervalu retained post-petition lien rights in property acquired during the Chapter 11 Cases. Subsequent to the entry of the Initial Cash Collateral Order, the Debtors, Supervalu, and the Committee have entered into seven (7) subsequent consent orders [Docket Nos. 106, 154, 225, 270, 310, 344 and 379] to establish a stipulated budget for the Debtors' use of cash collateral. A final hearing on the Debtors' use of cash collateral is scheduled for October 6, 2020.

## F.    Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors have a certain amount of time within which (a) to file their Plan; and (b) to solicit acceptances of their timely filed Plan before other parties in interest are permitted to file plans. The Court has entered Orders extending the Debtors' Exclusive Periods within which to file a plan and solicit acceptances thereto to October 2, 2020, and November 2, 2020, respectively [Docket No. 397]. Accordingly, no other party may file a plan.

## G.    Claims Bar Date

The Bankruptcy Court established the General Bar Dates of March 9, 2020 and July 30, 2020 as the deadline for each Person (other than governmental units, as defined in Section 101(27) of the Bankruptcy Code) to file proofs of claim for prepetition claims against the Debtors; and (ii) May 13, 2020 as the deadline for governmental units to file proofs of claim.

## H.    20 Day Claim Bar Date

On June 23, 2020 the Bankruptcy Court entered an *Order Establishing Bar Date for Filing Requests for Payment of Administrative Expense Claims Under Sections 105 and 503(b)(9) of the Bankruptcy Code, Approving Form, Manner and Sufficiency of Notice of the Bar Date Pursuant to Bankruptcy Rule 9007, and Approving Proof of Section 503(b)(9) Claim Form* [Docket No. 332], which established July 30, 2020 at 4:00 p.m. (prevailing Central Time**)** as the deadline for each person or entity to file a 20 Day Claim.

## I.    Payment of Administrative Expense Claims

Section 1129(a)(9) of the Bankruptcy Code states that unless the holder of an administrative expense claim agrees to a different treatment of such claim, the plan will provide that the holder of an administrative expense claim will receive on account of such claim cash equal to the allowed amount of such claim. 11 U.S.C. § 1129(a)(9).

Except to the extent that any entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim, shall be paid in full in Cash within five days of the later of (i) the Effective Date, or (ii) the date of entry of a Final Order determining and allowing such Claim as an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim.

## VII.
## POTENTIAL LITIGATION

### A. Retained Estate Causes of Action.

Except as otherwise provided in the Plan, each Cause of Action of any Debtor shall be preserved and, along with the exclusive right to commence, pursue, and enforce such Cause of Action in any appropriate court or tribunal, and shall revest exclusively in the Debtors as of the Effective Date.

Unless a claim or Cause of Action against a creditor or other Person is expressly waived, relinquished, released, compromised, settled or transferred in the Plan or any other Final Order, the Debtors expressly reserve such claim or Cause of Action for later pursuit by the Debtors and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon, after, or as a result of the Confirmation Date or Effective Date of the Plan, the Disclosure Statement, the Plan or the Confirmation Order.

Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods, tort, breach of contract or otherwise), or who has received goods from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, should assume that such obligation, transfer, or transaction may be reviewed by the Debtors subsequent to the Effective Date and may, to the extent not theretofore waived, relinquished, released, compromised, settled or transferred, be the subject of an action or claim or demand after the Effective Date, whether or not (a) such Person has filed a proof of claim against the Debtors in the Chapter 11 Cases, (b) such Person's proof of claim has been objected to, (c) such Person's Claim was included in the Debtors' Schedules, or (d) such Person's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent, or unliquidated.

**No Person may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them as any indication that the Debtors will not pursue any and all available Causes of Action against them. The Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise explicitly provided in the Plan.**

The retained claims and Causes of Action, include, without limitation:

• Causes of Action, including Avoidance Actions, as defined in the Plan;

26

- Objections to Claims under the Plan;

- Any and all litigation, claims, or Causes of Action of the Debtors and any rights, suits, damages, remedies, or obligations, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, relating to or arising from the acts, omissions, activities, conduct, claims, or Causes of Action listed or described in the Plan, Disclosure Statement, or the Confirmation Order;

- Any other litigation, claims or Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses, assets or operations or otherwise affecting the Debtors.

- Possible claims against vendors, customers or suppliers for warranty, indemnity, back charge, set-off issues, overpayment or duplicate payment issues and collections and accounts receivables matters;

- Possible claims against utilities or other Persons or parties for wrongful or improper termination of services to the Debtors;

- Possible claims for any breaches or defaults arising from the failure of any Persons or parties to fully perform under contracts with the Debtors before the assumption or rejection of the subject contracts;

- Possible claims for deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, factor or other Person;

- Possible claims for damages or other relief against any party arising out of environmental, asbestos and product liability matters;

- Actions against insurance carriers relating to coverage, indemnity or other matters;

- Counterclaims and defenses relating to notes or other obligations;

- Possible claims against local, state and federal taxing authorities (including, without limitation, any claims for refunds of overpayments);

- Contract, tort, or equitable claims which may exist or subsequently arise;

- Any claims of the Debtors arising under Section 362 of the Bankruptcy Code;

- Equitable subordination claims arising under Section 510 of the Bankruptcy Code or other applicable law;

- Any and all claims arising under chapter 5 of the Bankruptcy Code and all similar actions under applicable law, including, but not limited to, preferences under Section 547 of the Bankruptcy Code, turnover Claims arising under Sections 542 or 543 of the Bankruptcy Code, and fraudulent transfers under Section 548 of the Bankruptcy Code, including but not limited, to any transfers listed the Debtors' Statements of Financial Affairs;

27

Due to the size and scope of the Debtors' business operations and the multitude of business transactions therein, there may be numerous other claims and Causes of Action that currently exist or may subsequently arise, in addition to the claims and Causes of Action identified above. The Debtors are also continuing to investigate and assess which claims and Causes of Action may be pursued. The Debtors do not intend, and it should not be assumed that because any existing or potential claims or Causes of Action have not yet been pursued or do not fall within the list above, that any such claims or Causes of Action have been waived.

**B.**     **Pending Litigation.**

As of the date hereof, the only pending adversary proceeding involving the Debtors is:

> *Supervalu Wholesale Operations, Inc., as successor in interest to Supervalu Holdings, Inc., for itself and other entities affiliated with Supervalu, Inc. vs. J-H-J, Inc., et al.* AP No. 20-05003.

In addition, multiple lawsuits had been filed against the Debtors prior to the commencement of the cases, primarily involving personal injury claims alleged to have been incurred at various Stores of the Debtors. A listing of those lawsuits is provided as Exhibit "C". To the Debtors' knowledge, excluding the U.S. Bank, N.A. litigation, all matters listed in Exhibit "C" constitute Insured Claims.

**VIII.**
**THE CHAPTER 11 PLAN**

As a result of the Chapter 11 Cases and through the Plan, the Debtors submit that creditors will obtain a greater recovery under the Plan than any recovery that would be available if the Debtors' Assets were liquidated under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as Exhibit "A" and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

**A.**     **Classification.**

The Plan provides for the consolidation of Claims for allowance and distribution purposes, such that creditors, like the Class 1 and Class 2 Secured Creditors, with Allowed Claims against multiple Debtors will receive only one payment of their Claim, but their Allowed Claims will be paid in full. The proposed consolidation is entirely appropriate inasmuch as it recognizes that the Secured Creditors and certain other creditors considered and treated the Debtors as one economic and legal entity when extending credit to them. Among other things:

- JHJ is responsible for all administrative duties and management of each of the Debtors;
- The Iberia Secured Claim and the Supervalu Secured Claim, which represent by far the most significant amount of Claims against the Debtors' Estates, arise from loans that were to or were guaranteed by each of the Debtors;
- There are substantial inter-company claims, as detailed in the [Debtors' Schedules or Section VII(B)(6)].

28

Courts that have found plan consolidation objectionable did so because the consolidation materially altered creditors' recoveries. In other words, the consolidation resulted in a clear harm to creditors. Here, no harm is being visited upon any creditor class by the consolidation. Creditors' Allowed Claims are neither enhanced nor diminished by the consolidation proposed in the Amended Plan. The consolidation provided for in the Plan is, instead, for the purpose of streamlining the Claim allowance and distribution process.

The ability to consolidate arises under Section 1123(a)(5)(C) and the bankruptcy court's inherent general equitable powers, codified as Section 105(a). A court has full discretion to tailor its consolidation order to fit the circumstances of the case before it. For example, consolidation can merge the estates of several debtors for certain purposes, but does not always result in the elimination of the separate corporate entities.

**B.**    **<u>Treatment of Claims Against and Equity Interests in the Debtors.</u>**

The classes of Claims against and Equity Interests in the Debtors shall be treated under the Plan as follows:

     **1**     **Class 1 – Supervalu Secured Claim**

Classes 1A through 1I shall consist of the Supervalu Secured Claim Allowed in the amount of $7,223,327 plus the amount of the PACA Claim. The value of the Supervalu Secured Claim is the result of negotiations between the Debtors and Supervalu; however, such value remains subject to final approval of Supervalu. On account of and in full satisfaction of the Supervalu Secured Claim, the holder shall be treated as follows:

    (a)     PACA Claim:

           Supervalu shall receive Cash in the amount of $104,871 on the Plan Distribution Date.

    (b)     The balance of the Supervalu Secured Claim, *i.e.,* $7,223,327, shall be evidenced by a Plan promissory note (Plan Document) and related security documents in form and substance acceptable to Supervalu and the Debtors; shall continue to be secured by the Supervalu Collateral; and, shall be satisfied as follows:

        (i)     Cash in the amount of $500,000 on the Plan Distribution Date;

        (ii)     $4,138,741 shall be payable by the Debtors, over a seven-year term at an interest rate of 3% per annum, in weekly installment payments of $12,623.30 with a balloon payment of the balance due at maturity; and,

        (iii)     $2,584,586 shall be satisfied in accordance with the terms of the Amended and Restated Supply Agreement.

    (c)     All existing guarantees by parties other than the Debtors of the Supervalu Secured Claim, but excepting any guarantees of Danielle Satawa, shall be

amended, restated and reaffirmed, as applicable, to apply to the obligations of the Debtors to Supervalu under the Plan.

The Debtors, for and on behalf of themselves and their principals and owners, shall release any and all claims against Supervalu, including without limitation, (a) any Avoidance Actions and (b) the claims against Supervalu, listed as an Asset in each of the Debtors' Schedules in an unknown amount, relating to the purchase of the stores formerly operated by the Avondale

**2      Class 2 – Iberia Secured Claim**

Class 2 shall consist of the Iberia Secured Claim, which shall be Allowed in the principal amount of $8,630,701.28. On account of and in full satisfaction of the Iberia Secured Claim, the holder shall be treated as follows:

(a)     Iberia Loans:
The Iberia Loans shall, for purposes of the Plan, be consolidated into a single loan obligation. After payment of Iberia's Accrued Amounts, the Iberia Loans, as consolidated, shall be amortized over 15 years at an interest rate of 5.25% and shall be payable in 36 consecutive monthly installments as follows: commencing on the Plan Distribution Date, the Debtors shall pay 35 equal monthly payments of $42,530.86 and one balloon payment for the balance due.

(b)     SBA Loan:
After payment of Iberia's Accrued Amounts, the balance due under the SBA Loan shall be amortized over 15 years at a rate of 5.5% per annum. The resulting monthly payment shall be approximately $26,968.51.

(c)     Iberia's Accrued Amounts shall be paid on the Plan Distribution Date.

(d)     All Avondale Auction Proceeds shall be paid to Iberia on the Plan Distribution Date and applied to Iberia's Accrued Amounts.

(e)     The Iberia Secured Claim shall continue to be secured by the existing Iberia Collateral and guarantees granted to Iberia in connection with the Iberia Loans and the SBA Loan.

**3      Class 3 – Other Secured Claims**

Classes 3A through 3D shall consist of all Allowed Other Secured Claims. In the sole discretion of the Debtors, each holder of an Allowed Other Secured Claim shall be treated in one of the following ways (for the avoidance of doubt, all holders of Allowed Other Secured Claims need not be treated in the same way as long as each is treated in one of the following ways):

(a)     on the Effective Date, the legal, equitable, and contractual rights of each holder of an Allowed Other Secured Claim shall be reinstated in accordance with the provisions of section 1124(2) of the Bankruptcy Code notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim before the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date;  or,

(b)     on the Effective Date, the holder of an Allowed Other Secured Claim shall (i) retain a lien securing such Allowed Other Secured Claim and (ii) receive deferred Cash payments from the Debtors totaling at least the value of such Allowed Other Secured Claim as of the Effective Date; or

(c)     on the Effective Date, the collateral securing such Allowed Other Secured Claim shall be surrendered to the holder of such Allowed Other Secured Claim in full satisfaction of such Allowed Other Secured Claim; or

(d)     the holder of an Allowed Other Secured Claim shall be paid Cash in an amount equal to the value of such holder's Allowed Other Secured Claim, on or before the later of (i) the Plan Distribution Date and (ii) the date that is ten (10) Business Days after the entry of a Final Order allowing such Claim as an Other Secured Claim, or as soon thereafter as practicable.  To the extent the collateral securing an Allowed Other Secured Claim has been or is sold pursuant to an Order of the Bankruptcy Court, the amount paid to the holder of such Allowed Other Secured Claim pursuant to the preceding sentence shall be net of the costs of sale of such collateral and otherwise subject to the rights of the Debtors pursuant to section 506(c) of the Bankruptcy Code.

The failure of any party to object to any Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Debtors to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the holder of such Claim.

Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition liens on property of the Debtors held with respect to an Allowed Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory

31

provisions governing such Claim until such Claim is satisfied, at which time such lien shall be released, shall be deemed null and void, and shall be unenforceable for all purposes; provided, however, that the Debtors may condition delivery of any final payment upon receipt of an executed release of the lien. Any and all liens securing any Other Secured Claim that is not Allowed shall be released, shall be deemed null and void, and shall be unenforceable for all purposes. Upon satisfaction or disallowance of an Other Secured Claim, the holder of an Other Secured Claim hereby authorizes the appropriate Debtor(s) to file any UCC termination statements necessary to effect termination of any lien securing a Other Secured Claim. Nothing in this Plan shall preclude the Debtors from challenging the validity of any alleged lien on any asset of the Debtors or the value of the property that secures any alleged lien.

Treatment of an Allowed Other Secured Claim in accordance with the foregoing shall not affect any Allowed General Unsecured Claim held by the same claimant that is a deficiency claim under section 506 of the Bankruptcy Code.

### 4        Class 4 –General Unsecured Claims

Classes 4A through 4I shall consist of all Allowed General Unsecured Claims. Except for Insured Claims, each holder of a General Unsecured Claim shall receive, on account of and in full satisfaction of such Claim, Cash totaling 40% of the Allowed General Unsecured Claim, payable in 60 (sixty) consecutive quarterly installments, commencing on the first day of the quarter following the Effective Date. Any Insured Claim shall first be satisfied from the proceeds of any applicable Insurance Policy as set forth in Section 13.2.2 of the Plan.

### 5        Class 5 – Convenience Class Claims

Classes 5A through 5I shall consist of all Allowed Convenience Class Claims. Each holder of a Convenience Class Claim shall receive, in full satisfaction and settlement of its Allowed Convenience Class Claim, Cash totaling 20% of the Allowed Convenience Class Claim, payable in four (4) consecutive quarterly installments, commencing on the first day of the quarter following the Effective Date.

### 6        Class 6 – Intercompany Claims

On the Effective Date, all Intercompany Claims will be extinguished, and no holder of an Intercompany Claim will receive or retain any property or rights under the Plan on account of such Claim.

### 7        Class 7 – Equity Interests

Classes 7A through 7I shall consist of all Allowed Equity Interests. The Debtors shall not make any distributions on account of Allowed Equity Interests until the Allowed Claims of all non-Insider creditors have been paid in accordance with the terms of the Plan, except that if one or more Debtors is a Subchapter S corporation or a so-called "pass-through" entity or is taxed as a partnership entity, such Debtor(s) may make distributions to the holders of its Equity Interests in an amount equal to the state and federal income taxes of the holders of its Equity Interests attributable to the income of such Debtor(s) .

**C.**    **Sources of Cash for Plan Distributions.**

All Cash necessary to make payments and Plan Distributions under the Plan shall be obtained from Estate Cash and income generated from the Debtors' future business operations.

**D.**    **Discharge of the Debtors**

Except as otherwise provided in the Plan or in the Confirmation Order, rights afforded in, and all consideration distributed under, this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their Assets. Upon the Effective Date, except as otherwise provided for in the Plan or Confirmation Order, the Debtors shall be deemed discharged and released under section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims, including, without limitation, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Claim based upon such debt is Allowed under Section 501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted this Plan. Nothing in the Plan or Confirmation Order constitutes a determination as to the applicability of 11 U.S.C. §1141(d)(6)(A) and the rights of a domestic governmental unit under such section are preserved.

**As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan any Claims, rights, causes of action, liabilities, or Equity Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.**

**E.**    **Exculpation, Injunction and Limitation of Liability**

    **1**    **Exculpation**

**No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Cases, entry into the Liquidation Trust Agreement, entry into the Settlement Agreement, the Debtors' entry into any asset purchase agreement during the Chapter 11 Cases, the consummation of any transactions contemplated therein, the negotiation and pursuit of the Plan, or the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, and the issuance of securities under or in connection with the Plan or the transactions contemplated by the foregoing, except for willful misconduct, gross negligence, or intentional fraud as determined by Final Order of the Bankruptcy Court, but in all respects such Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to the Plan. The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of any securities pursuant to the Plan, and are not, and on account of such distributions shall not be, liable at any time for the violation of any**

33

applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.

> **2    Injunction**

From and after the Effective Date, to the extent of the releases and exculpations granted in this Plan, the releasing parties shall be permanently enjoined from commencing or continuing in any manner against the released parties and the Exculpated Parties and their assets and properties, as the case may be, any suit, action, or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest, or remedy released pursuant to this Plan.

## IX.
## CONFIRMATION AND CONSUMMATION PROCEDURES

**A.    Overview**

Please see Discussion at Section III.A.

**B.    Confirmation of the Plan**

> **1    Elements of Section 1129 of the Bankruptcy Code**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

> a.    The Plan complies with the applicable provisions of the Bankruptcy Code.

> b.    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

> c.    The Plan has been proposed in good faith and not by any means proscribed by law.

> d.    Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

e.     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors or a successor to the Debtors under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

f.     With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

g.     In the event that the Debtors do not seek to confirm the Plan non-consensually, each class of Claims or Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

h.     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full, in Cash, on the Effective Date and Tax Claims will be paid in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the allowed amount of such Tax Claims.

i.     At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

j.     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any other successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

k.     All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

**The Debtors believe that the Plan will satisfy all the statutory provisions of chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all of the provisions of the Bankruptcy Code, and that the Plan is being proposed and submitted to the Bankruptcy Court in good faith.**

## 2     Acceptance

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims actually voting.  Each class of Equity Interests will have accepted the Plan if the Plan is accepted with reference to a class of Equity Interests, by at least

35

two-thirds in amount of the Allowed Equity Interests of each class of Equity Interests actually voting.

### 3      Best Interests of Creditors Test

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtors were liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtors in a chapter 7 liquidation case. The proceeds that would be available for satisfaction of impaired Claims against and Equity Interests in the Debtors would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtors and the cash held by the Debtors at the time of the commencement of the liquidation case. Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 cases. Whereas the Liquidation Trustee and its counsel has the background and familiarity with the remaining assets to be liquidated to realize the most money for the costs to be incurred to complete the process, a chapter 7 trustee and the persons it employs would need time to develop the necessary industry and debtor specific knowledge necessary to assist the chapter 7 trustee examine and distribute the Debtors' assets. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay impaired Claims arising on or in addition to the foregoing, it is expected that the liquidation of remaining assets, under chapter 7 of the Bankruptcy Code would yield less value due to the expeditious liquidation as required by chapter 7 than they are expected to yield under the Plan.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtors (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Equity Interests under the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including (i) the additional costs associated with the appointment of the chapter 7 trustee and (ii) the erosion in value of assets in chapter 7 cases, in the context of the expeditious liquidation required under chapter 7, the Debtors have determined that confirmation of the Plan will provide each holder of an impaired Claim with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### 4      Feasibility

The Bankruptcy Code conditions confirmation of a chapter 11 plan on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor.  For purposes of determining whether the Plan satisfies this condition, the Debtors have prepared financial projections, which include Plan Distributions, for the life of the Plan.   The Debtors believe such projections to be reasonable based on historical income and expenses of the Debtors' Store operations and the Debtors' knowledge and experience gained therefrom. The Debtors thus submit that the Estate Cash and income generated from future operations will be sufficient to satisfy all Plan Distributions contemplated under the Plan.

### C.      Confirmation without Acceptance of All Impaired Classes – "Cramdown"

In the event that any impaired class does not accept the Plan, the Debtors may nevertheless move for confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they reserve the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other classes of Claims that vote to reject the Plan.  The Debtors may seek confirmation of the Plan under Section 1129(b) as to certain Claims.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

### D.      Effect of Confirmation

Under section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan.  Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

# X.
## TAX ISSUES

For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest and other fees, premiums and charges, as applicable.

**In connection with the Plan, the Debtors shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution. The Debtors have the right to withhold a Plan Distribution until such holder has made arrangements satisfactory to the Debtors for payment of any such tax obligations. The Debtors have the right to withhold a Plan distribution until the holder of the Claim upon which distribution is to be made provides the Debtors with IRS Form W-9 and any other information determined by the Debtors to be necessary or appropriate to effect information reporting and the withholding of taxes. If the Debtors have not received IRS Form W-9 or other requested tax reporting information from the holder of a Claim before the relevant Plan Distribution Date, any property or Cash to be distributed pursuant to the Plan shall, pending receipt of IRS Form W-9 or such other requested information, be treated as an unclaimed distribution under the Plan, as set forth in Section 9.3.2 of the Plan.**

**THE FOREGOING HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.**

# XI.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A.  Assumption and Rejection of Executory Contracts and Unexpired Leases.

(i)  On the Effective Date, except as otherwise provided for in the Plan, all executory contracts and unexpired leases of the Debtors shall be assumed pursuant to the provisions of section 365 of the Bankruptcy Code, except: (i) any executory contracts and unexpired leases that are or were the subject of separate motions to reject, assume or assume and assign Filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of the Confirmation Order, including without limitation the Store Leases Order; and, (ii) any executory contracts or unexpired leases rejected

38

pursuant to 11.1(b) of the Plan. Any order entered post-confirmation by the Bankruptcy Court, after notice and a hearing, authorizing or relating to the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered pre-confirmation.

(ii)    Notwithstanding Section 11.1(a) of the Plan, all executory contracts and/or unexpired leases identified in Exhibit "F" of the Disclosure Statement shall be rejected, pursuant to the provisions of section 365 of the Bankruptcy Code, as of the Effective Date.

(iii)    Receipt of this Plan by the counterparties to the executory contracts and unexpired leases of the Debtors rejected pursuant to Plan Section 11.1(b) shall constitute adequate and sufficient notice that (i) any Claims arising under the contract, lease or other agreement or related thereto shall be treated under the Plan as General Unsecured Claims as against the respective Debtor that was a party to the contract, lease or other agreement, and (ii) the Debtors are no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising thereunder.

(iv)    The Plan shall constitute a motion to reject such executory contracts and unexpired leases rejected pursuant to Section 11.1(b) of the Plan, and the Debtors shall have no liability thereunder except as is specifically provided in the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their Estates.

(v)    The Confirmation Order shall constitute an order of the Bankruptcy Court approving all such assumptions, assignments and rejections as of the Effective Date pursuant to Section 365(a) of the Code and a finding by the Bankruptcy Court that each such assumption and assignment is in the best interest of the respective Debtor(s), its estate, and all parties in interest, and adequate assurance of future performance under the contract or lease to be assumed and assigned has been provided.

(vi)    Notwithstanding the rejection of any of the Debtors' executory contracts under this Plan or by separate motion, the Debtors shall retain and be entitled to enforce any warranties provided to, or for the benefit of, the Debtors under applicable federal or state law; provided, however, for the avoidance of doubt, that the foregoing does not include any warranties provided to, or for the benefit of, the Debtors pursuant to any contract that

has been assumed and assigned by order entered by the Bankruptcy Court on or before the Effective Date.

**B.**    <u>**Claims for Cure Payments arising from Assumption of Unexpired Leases or Executory Contracts.**</u>

All non-Debtor parties to the executory contracts and unexpired leases identified on Exhibit "F" to the Disclosure Statement shall have been given independent notice, prior to or simultaneously with the mailing of Ballots, of the Debtors' intention to assume and/or assign such agreements and the related Plan treatment outlined below. **Unless the non-Debtor party to any executory contract or unexpired lease to be assumed or assumed and assigned Files and serves on the Debtors an objection to assumption and/or assignment of such executory contract or unexpired lease, or assertion of any "cure amount" or "cure" required in connection with such assumption, on or before (i) the last date established by the Bankruptcy Court to File and serve objections to Confirmation of the Plan, or (ii) such other date as is set by the Bankruptcy Court, then such executory contract or unexpired lease shall be deemed to be assumed and any default then existing shall be deemed cured as of the Effective Date and the respective Debtor(s) shall have no other cure obligation in connection with such assumption.** In the event of a timely Filed and served objection regarding (1) existing defaults and the amount of any cure payments, (2) the ability of the respective Debtor(s) to provide adequate assurance of future performance under the contract or lease to be assumed or (3) any other matter pertaining to assumption, any cure payment required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption; provided that the Debtor(s) shall have the right to reject any executory contract or unexpired lease within five (5) days after entry of a Final Order establishing a cure amount with respect to the assumption of said executory contract or unexpired lease.

Any monetary defaults determined by the Bankruptcy Court to exist under an executory contract and/or unexpired lease to be assumed under the Plan shall be satisfied by the respective Debtor(s) under section 365(b)(1) of the Bankruptcy Code, either by payment of the cure amount (if any), in Cash, on the Plan Distribution Date, or on such other terms as agreed to by the Debtors and the non-debtor party to the executory contract or unexpired lease, or ordered by the Bankruptcy Court. **The Debtors assert that no cure payments are due with respect to any leases or executory contracts that are being assumed.**

**C.**    <u>**Claims Arising from Rejection, Expiration or Termination.**</u>

Claims created by the rejection of executory contracts and unexpired leases pursuant to this Plan must be Filed with the Bankruptcy Court no later than thirty (30) days after the Confirmation Date. **Any such Claims for which a proof of claim is not Filed and served by the deadlines set forth above will be forever barred from assertion and shall not be enforceable against the Debtors, their Estates or their Assets**. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely Filed as provided herein shall be treated as General Unsecured Claims under the Plan subject to objection by the Debtors.

# XII.
## RISK FACTORS

There are many risks and uncertainties in respect of the Plan and its implementation. The holders of Claims against and Interests in the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement, before deciding whether to vote to accept or reject the Plan. The risk factors identified below should not be regarded as the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

## A.     Certain Bankruptcy Considerations

### 1     Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims against and Equity Interests in the Debtors under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2     Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims or Allowed Equity Interests as those proposed in the Plan.

### 3     The Debtors May Not Be Able To Secure Confirmation or Consummation of the Plan

The Plan requires the acceptance of a requisite number of holders of Claims that are entitled to vote on the Plan, and the approval of the Bankruptcy Court, as described in the section of this Disclosure Statement entitled "Confirmation and Consummation Procedures – Overview." There can be no assurance that such acceptances and approvals will be obtained and therefore, that the Plan will be confirmed. In addition, confirmation of the Plan and the occurrence of the Effective Date of the Plan are subject to the satisfaction of certain conditions precedent. Although the Debtors believe that the conditions precedent to the confirmation of the Plan and to the occurrence of the Effective Date of the Plan will be met, there can be no assurance that all such conditions precedent will be satisfied. If any condition precedent is not satisfied or waived pursuant to the Plan, the Plan may not be confirmed or the Effective Date may not occur.

41

Furthermore, although the Debtors believe that the Plan will be confirmed and the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will occur. Further, and notwithstanding the foregoing or anything in the Plan to the contrary, the Debtors have reserved their rights pursuant to the Plan to delay the occurrence of the Effective Date with respect to one or more of the Debtors' Estates to a later date; provided, however, that any such election by the Debtors to delay the occurrence of the Effective Date with respect to one Estate shall not prevent the occurrence of the Effective Date with respect to any of the other Estates. If the Plan is not confirmed or the Effective Date does not occur, there can be no assurance that any alternative chapter 11 plan would be on terms as favorable to the holders of Claims and Equity Interests as the terms of the Plan. In addition, if a protracted reorganization or liquidation were to occur, there is a substantial risk that holders of Claims and Equity Interests would receive less than they would receive under the Plan. A liquidation analysis prepared by the Debtors with the assistance of their advisors is attached hereto as Exhibit D.

If the Plan is not confirmed and does not go effective for any reason and the Debtors or some other party in interest decide to prosecute a different plan, recoveries to holders of Claims against or Equity Interests in the Debtors may be negatively impacted. If the Plan is confirmed but the Effective Date does not occur, it may become necessary to amend the Plan to provide for alternative treatment of Claims and Equity Interests. There can be no assurance that any such alternative treatment would be on terms as favorable to the holders of Claims and Equity Interests as the treatment provided under the Plan. If any modifications to the Plan are materially adverse to any holders of Claims or Equity Interests, it would be necessary to resolicit votes from holders of such Claims or Equity Interests, which would, at the very least, further delay confirmation and consummation of the Plan, and could jeopardize the consummation of the Plan.

## XIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have concluded that the Plan will maximize recoveries to holders of Claims and Equity Interests. If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in substantially smaller distributions being made to creditors than those provided for under the Plan because (i) the chapter 7 trustee's unfamiliarity with the Debtors and their industry and assets would lead to additional costs for the Estates and (ii) in a liquidation of the Debtors under chapter 7, the Debtors would be unable to generate future income to fund payments to creditors. Accordingly, the Debtors have determined that confirmation of the Plan will likely provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7.

## XIV.
## <u>CONCLUSION</u>

The Debtors believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: October 2, 2020

Respectfully submitted,

J-H-J, Inc., on behalf of itself and each of the other Debtors

By: /s/Garnett C. Jones, Jr.
Name: Garnett C. Jones, Jr.
Title: President and Member

43